**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| DONALD M. LUSNAK, on behalf of himself and all others similarly situated,<br><br>*Plaintiff-Appellant*,<br><br>v.<br><br>BANK OF AMERICA, N.A.,<br>*Defendant-Appellee.* | No. 14-56755<br><br>D.C. No. 2:14-cv-01855-GHK-AJW<br><br><br>OPINION |

Appeal from the United States District Court
for the Central District of California
George H. King, District Judge, Presiding

Argued and Submitted November 7, 2016
Pasadena, California

Filed March 2, 2018

Before: Marsha S. Berzon, Morgan Christen,
and Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge Nguyen

# SUMMARY[*]

## Preemption / National Bank Act

The panel reversed the district court's dismissal of a putative class action; held that that the National Banking Act did not preempt California's state escrow interest law, Cal. Civil Code § 2954.8(a); and remanded so that the plaintiff could proceed with his California Unfair Competition Law ("UCL") and breach of contract claims against Bank of America.

Plaintiff filed his lawsuit on behalf of himself and a proposed class of similarly situated Bank of America customers, alleging that the Bank violated both California state law and federal law by failing to pay interest on his escrow account funds.

In 2010, Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act. Titles X and XIV of Dodd-Frank aim to prevent, and mitigate the effects of, another mortgage crisis.

The panel held that although Dodd-Frank significantly altered the regulatory framework governing financial institutions, with respect to National Bank Act preemption, it merely codified the existing standard established in *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25 (1996). Applying that standard, the panel held that the National Bank Act did not preempt Cal. Civil Code

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

§ 2954.8(a) because it did not prevent or significantly interfere with Bank of America's exercise of its powers.

Turning to plaintiff's claims for relief, the panel held that plaintiff may proceed with his California UCL and breach of contract claims against Bank of America. The panel held that plaintiff could not rely on 15 U.S.C. § 1639d(g)(3) in prosecuting his UCL claim where plaintiff's escrow account was established prior to the effective date of the section, but this did not preclude him from obtaining relief under the theory that the Bank violated the UCL by failing to comply with Cal. Civil Code § 2954.8(a).

## COUNSEL

Roger N. Heller (argued), Jordan Elias, and Michael W. Sobol, Lieff Cabraser Heimann & Bernstein LLP, San Francisco; Jae K. Kim and Richard D. McCune, Redlands, California; for Plaintiff-Appellant.

Mark William Mosier (argued), Andrew Soukup, and Keith A. Noreika, Covington & Burling LLP, Washington, D.C.; Peter J. Kennedy and Marc A. Lackner, Reed Smith LLP, Los Angeles, California; for Defendant-Appellee.

**OPINION**

NGUYEN, Circuit Judge:

Congress significantly altered the regulation of financial institutions with the enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"). This sweeping piece of legislation was a response to the worst financial crisis since the Great Depression, in which millions of Americans lost their homes. This appeal requires us to determine whether in light of Dodd-Frank, the National Bank Act ("NBA") preempts California's state escrow interest law, California Civil Code § 2954.8(a).

California's escrow interest law, enacted in 1976, requires financial institutions to pay borrowers at least two percent annual interest on the funds held in the borrowers' escrow accounts. This type of account is often set up in conjunction with a mortgage, either as a condition set by the lender or at the request of the borrower. Its purpose is to ensure payment of obligations such as property taxes and insurance. These accounts often carry a significant positive balance.

Plaintiff Donald Lusnak, on behalf of a putative class, filed suit against Bank of America, which does not pay borrowers any interest on the positive balance in their accounts. The district court dismissed the suit on the ground that the NBA preempted California Civil Code § 2954.8(a).

We reverse. Although Dodd-Frank significantly altered the regulatory framework governing financial institutions, with respect to NBA preemption, it merely codified the existing standard established in *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25 (1996). Applying that standard here, we hold that the NBA does not preempt

California Civil Code § 2954.8(a), and Lusnak may proceed with his California Unfair Competition Law ("UCL") and breach of contract claims against Bank of America.

## I.  Background

### A.  The National Bank Act

"In 1864, Congress enacted the NBA, establishing the system of national banking still in place today." *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 10 (2007) (citations omitted).  The NBA provides for the formation of national banks and grants them several enumerated powers as well as "'all such incidental powers as shall be necessary to carry on the business of banking.'"  *Id.* at 11 (quoting 12 U.S.C. § 24(Seventh)).  Congress established the Office of the Comptroller of the Currency ("OCC") to charter, regulate, and supervise these national banks.  National Bank Act, 38 Cong. Ch. 106, § 1, 13 Stat. 99, 99–100 (1864)[1]; *About the OCC*, Office of the Comptroller of the Currency, https://www.occ.treas.gov/about/what-we-do/mission/index-about.html (last visited Jan. 25, 2018) ("The OCC charters, regulates, and supervises all national banks . . . .").

The NBA also ushered in a "dual banking system," wherein banks could be chartered either by the OCC or by a State authority and be subject to different legal requirements and oversight from different regulatory bodies.  *See First Nat'l Bank of Fairbanks v. Camp*, 465 F.2d 586, 592 (D.C. Cir. 1972); Kenneth E. Scott, *The Dual Banking System: A Model of Competition in Regulation*, 30 Stan. L. Rev. 1

---

[1] The Act was renamed "the national-bank act" in 1874.  An Act Fixing the Amount of United States Notes, 43d Cong. Ch. 343, § 1, 18 Stat. 123, 123 (1874).

(1977). Since the NBA's enactment, the Supreme Court has often ruled on the scope of State authority to regulate national banks. *See Watters*, 550 U.S. at 11–13. Congress has also enacted legislation "[t]o prevent inconsistent or intrusive state regulation from impairing the national system." *See id.* at 11.

## B. Dodd-Frank

In 2010, Congress enacted Dodd-Frank in response to a "financial crisis that nearly crippled the U.S. economy."[2] S. Rep. No. 111-176, at 2 (2010); *see also id.* at 15 ("It has become clear that a major cause of the most calamitous worldwide recession since the Great Depression was the simple failure of federal regulators to stop abusive lending, particularly unsustainable home mortgage lending." (quoting *The Creation of a Consumer Financial Protection Agency to Be the Cornerstone of America's New Economic Foundation: Hearing Before S. Comm. On Banking, Hous., and Urban Affairs*, 111th Cong. 82 (2009) (Statement of Travis Plunkett, Legislative Director, Consumer Federation of America))). Dodd-Frank brought about a "sea change" in the law, affecting nearly every corner of the nation's financial markets. *See, e.g.*, *Loan Syndications & Trading Ass'n v. S.E.C.*, 818 F.3d 716, 718 (D.C. Cir. 2016); Damian Paletta & Aaron Lucchetti, *Law Remakes U.S. Financial Landscape*, Wall St. J., July 16, 2010, at A1 ("Congress approved a rewrite of rules touching every corner of finance . . . ."). One of Congress's main goals in this sweeping

---

[2] The crisis resulted in 9.3 million lost homes, 8.8 million lost jobs, and $19.2 trillion in lost household wealth. *See* U.S. Dep't of the Treasury, The Financial Crisis Response in Charts 3 (2012); Laura Kusisto, *Many Who Lost Homes to Foreclosure in Last Decade Won't Return*, Wall St. J., Apr. 20, 2015, at A2.

legislation was to prevent another mortgage crisis, which resulted in "unprecedented levels of defaults and home foreclosures." *See, e.g.*, H.R. Rep. No. 111-94, at 48 (2009).

Titles X and XIV of Dodd-Frank, at issue in this case, aim to prevent, and mitigate the effects of, another mortgage crisis. In a section of Title X called "Preservation of State Law," Congress addressed the framework of NBA preemption determinations. These provisions were designed to address "an environment where abusive mortgage lending could flourish without State controls." S. Rep. No. 111-176, at 17. Congress aimed to undo broad preemption determinations, which it believed planted the seeds "for long-term trouble in the national banking system." *Id.* at 17. In a section of Title XIV called "Escrow and Impound Accounts Relating to Certain Consumer Credit Transactions," Congress established a series of measures to help borrowers understand their mortgage obligations. Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, § 1461, 124 Stat. 1376, 2178–81 (2010) (codified at 15 U.S.C. § 1639d). These provisions were designed to correct abusive and deceptive lending practices that contributed to the mortgage crisis, specifically with regard to the administration of escrow accounts for property taxes and insurance. H.R. Rep. No. 111-94, at 53–56.

## C. Factual Background

In July 2008, Lusnak purchased a home in Palmdale, California with a mortgage from Countrywide Financial. Soon thereafter, Bank of America purchased Countrywide Financial and assumed control over Lusnak's mortgage. In March 2009, Lusnak refinanced his mortgage, and in January 2011, he and Bank of America agreed to modify certain terms. The 2009 agreement and 2011 modification

contain the relevant terms governing Lusnak's mortgage. The agreements provide that Lusnak's mortgage "shall be governed by federal law and the law of the jurisdiction in which the Property is located." The parties agree that the terms of Lusnak's mortgage require Bank of America to pay interest on escrow funds if required by federal law or state law that is not preempted.

As a condition for obtaining a mortgage, Lusnak was required to open a mortgage escrow account into which he pays $250 per month. Lusnak alleges that Bank of America is able to enrich itself by earning returns on funds in his account. Bank of America acknowledges that it does not comply with state escrow interest laws and that Wells Fargo—its chief competitor and the largest mortgage banker in America—does. But it contends that no federal or "applicable" state law requires it to pay interest on Lusnak's escrow account funds.

### D. Procedural History

On March 12, 2014, Lusnak filed this lawsuit on behalf of himself and a proposed class of similarly situated Bank of America customers. Pursuant to the "unlawful" prong of California's UCL, Lusnak alleged that Bank of America violated both state law, Cal. Civ. Code § 2954.8(a), and federal law, 15 U.S.C. § 1639d(g)(3), by failing to pay interest on his escrow account funds. Lusnak also brings a breach of contract claim, alleging that Bank of America's failure to pay interest violated his mortgage agreement. Bank of America promptly moved to dismiss on the ground that California Civil Code § 2954.8(a) is preempted by the NBA.

The district court granted the motion to dismiss. *Lusnak v. Bank of Am., N.A.*, No. CV 14-1855-GHK (AJWx), 2014

WL 6779131 (C.D. Cal. Oct. 29, 2014). It first acknowledged that Dodd-Frank clarified and amended the NBA preemption framework. *Id.* at *3–5. The district court then concluded that California's escrow interest law "prevents or significantly interferes with" banking powers and therefore is preempted by the NBA. *Id.* at *7–8. In so concluding, the district court determined that section 1639d(g)(3) of Dodd-Frank did not impact the preemption analysis. *Id.* at *8–9. This appeal followed.

## II. Jurisdiction and Standard of Review

We have jurisdiction under 28 U.S.C. § 1291. This court reviews de novo a district court's dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Aguayo v. U.S. Bank*, 653 F.3d 912, 917 (9th Cir. 2011). "Questions of statutory interpretation are reviewed de novo . . . as are questions of preemption." *Lopez v. Wash. Mut. Bank*, 302 F.3d 900, 903 (9th Cir. 2002) (citations omitted).

## III. Discussion

The central question here is whether the NBA preempts California Civil Code § 2954.8(a). Section 2954.8(a) requires "[e]very financial institution" to pay "at least 2 percent simple interest per annum" on escrow account funds.[3] The portion of Dodd-Frank to which the parties draw

---

[3] In full, California Civil Code § 2954.8(a) states:

> Every financial institution that makes loans upon the security of real property containing only a one- to four-family residence and located in this state or purchases obligations secured by such property and that receives money in advance for payment of taxes and assessments on the property, for insurance, or for other

this court's attention, section 1639d(g)(3), which amends the Truth in Lending Act ("TILA"), states:

> (3) Applicability of payment of interest
>
> If prescribed by applicable State or Federal law, each creditor shall pay interest to the consumer on the amount held in any impound, trust, or escrow account that is subject to this section in the manner as prescribed by that applicable State or Federal law.

15 U.S.C. § 1639d(g)(3). According to Lusnak, this section's plain language—requiring creditors to pay interest on escrow fund accounts like his if "prescribed by applicable" state law—made clear that Congress perceived no conflict between state laws like California Civil Code § 2954.8(a) and the powers of national banks. Therefore, Congress clearly did not intend for these state laws to be preempted by the NBA. Bank of America counters that such state laws are preempted because they prevent or significantly interfere with the exercise of its banking powers, and a preempted law cannot be an "applicable" law under section 1639d(g)(3). We begin by examining the relevant preemption framework.

---

purposes relating to the property, shall pay interest on the amount so held to the borrower. The interest on such amounts shall be at the rate of at least 2 percent simple interest per annum. Such interest shall be credited to the borrower's account annually or upon termination of such account, whichever is earlier.

## A. Preemption Framework

1. *Guiding Principles of Preemption*

Our analysis is governed by "the two cornerstones of . . . preemption jurisprudence." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009). "First, 'the purpose of Congress is the ultimate touchstone in every pre-emption case.'" *Id.* (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). "[W]hen Congress has made its intent known through explicit statutory language, the courts' task is an easy one." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990). Second, we start with the assumption that the State's historic police powers are not preempted "unless that was the clear and manifest purpose of Congress." *Wyeth*, 555 U.S. at 565 (quoting *Medtronic*, 518 U.S. at 485).

In the context of the NBA, Dodd-Frank provides that state laws are preempted if they "prevent[] or significantly interfere[] with the exercise by the national bank of its powers." 12 U.S.C. § 25b(b)(1)(B). Applying this standard, there is no presumption against preemption. *See Bank of Am. v. City & Cty. of San Francisco*, 309 F.3d 551, 558 (9th Cir. 2002). This does not, however, absolve a national bank of the burden of proving its preemption defense. *See Dilts v. Penske Logistics, LLC*, 769 F.3d 637, 649 (9th Cir. 2014) ("Defendants . . . bear the burden of proof in establishing the affirmative defense of preemption."). Where, as here, we are confronted with state consumer protection laws, "a field traditionally regulated by the states, compelling evidence of an intention to preempt is required." *Aguayo*, 653 F.3d at 917 (quoting *Gen. Motors Corp. v. Abrams*, 897 F.2d 34, 41–42 (2d Cir. 1990)). Accordingly, because this case involves state regulation of consumer credit, Bank of America must affirmatively demonstrate that Congress intended to preclude states from enforcing their escrow interest laws.

2.  *Dodd-Frank's Amendments to the NBA Preemption Framework*

Dodd-Frank addressed the preemptive effect of the NBA in several ways.  First, it emphasized that the legal standard for preemption set forth in *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25 (1996), applies to questions of whether state consumer financial laws are preempted by the NBA.  12 U.S.C. § 25b(b)(1)(B).  Second, it required the OCC to follow specific procedures in making any preemption determination.  *See id.* §§ 25b(b)(1)(B) (requiring the OCC to make any preemption determination on a "case-by-case basis"); 25b(b)(3)(B) (requiring the OCC to consult the Bureau of Consumer Financial Protection when making a preemption determination).  And third, it clarified that the OCC's preemption determinations are entitled only to *Skidmore* deference.  12 U.S.C. § 25b(b)(5)(A); *see Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (explaining that an agency's views are "entitled to respect" only to the extent that they have the "power to persuade").  Of these, only the second amendment was an actual change in the law.  The first and third amendments merely codified existing law as set forth by the Supreme Court.

Before Dodd-Frank, the Supreme Court held in *Barnett Bank* that states are not "deprive[d] . . . of the power to regulate national banks, where . . . doing so does not *prevent or significantly interfere* with the national bank's exercise of its powers."  517 U.S. at 33 (emphasis added).  This is because "normally Congress would not want States to forbid, or to impair significantly, the exercise of a power that Congress explicitly granted."  *Id.*

Following *Barnett Bank*, the OCC issued in 2004 its interpretation of the NBA preemption standard: "Except

where made applicable by Federal law, state laws that obstruct, impair, or condition a national bank's ability to fully exercise its Federally authorized real estate lending powers do not apply to national banks." 12 C.F.R. § 34.4(a) (effective Jan. 13, 2004). The OCC framed its interpretation as merely reflecting *Barnett Bank* and earlier obstacle preemption case law. *See* Bank Activities and Operations; Real Estate Lending and Appraisals, 69 Fed. Reg. 1904, 1910 (Jan. 13, 2004) ("The OCC intends this phrase as the distillation of the various preemption constructs articulated by the Supreme Court, as recognized in Hines and Barnett, and not as a replacement construct that is in any way inconsistent with those standards."). But its formulation raised concern and confusion over the scope of NBA preemption.[4]

We never addressed whether the OCC's interpretation was inconsistent with *Barnett Bank*, or whether the regulation was owed deference while it was in effect. The Supreme Court, however, has indicated that regulations of

---

[4] The OCC's preemption rule reads more broadly than *Barnett Bank*'s "prevent or significantly interfere" standard in two respects. First, the OCC omitted the intensifier "significantly" and used the terms "impair" and "condition" rather than "interfere." Second, it insisted that banks be able to "fully" exercise their NBA powers. *See* Staff of H. Comm. on Fin. Servs., 108th Cong., Views and Estimates of the Committee on Financial Services on Matters to be Set Forth in the Concurrent Resolution on the Budget for Fiscal Year 2005 15–16 (Comm. Print 2004) ("[The OCC's 2004] rules may represent an unprecedented expansion of Federal preemption authority . . . ."); Jared Elosta, *Dynamic Federalism and Consumer Financial Protection: How the Dodd-Frank Act Changes the Preemption Debate*, 89 N.C. L. Rev. 1273, 1280 (2011) ("[T]here is reason to believe that the OCC went beyond clarifying Barnett Bank and in fact made it much easier for the OCC to preempt state laws than the Barnett Bank standard would allow.").

this kind should receive, at most, *Skidmore* deference—and even then, only as to a conflict analysis, and not as to the legal conclusion on preemption. In *Wyeth v. Levine*, the Supreme Court noted that when Congress has not authorized an agency to preempt state law directly, the Court "ha[s] not deferred to an agency's *conclusion* that state law is pre-empted." 555 U.S. at 576. Rather, it "ha[s] attended to an agency's explanation of how state law affects the regulatory scheme" based on the agency's "unique understanding of the statutes [it] administer[s] and [its] attendant ability to make informed determinations about how state requirements may pose an 'obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* at 576–77 (citations omitted). And the weight to be accorded an agency's explanation of a state law's impact on a federal scheme "depends on its thoroughness, consistency, and persuasiveness." *Id.* at 577; *see Skidmore*, 323 U.S. at 140.

We conclude that under *Skidmore*, the OCC's regulation would have been entitled to little, if any, deference in light of *Barnett Bank*, even before the enactment of Dodd-Frank. This regulation was the OCC's articulation of its legal analysis; the OCC simply purported to adopt the Supreme Court's articulation of the applicable preemption standards in prior cases, but did so inaccurately. *See* 69 Fed Reg. at 1910 ("We have adopted in this final rule a statement of preemption principles that is consistent with the various formulations noted [in Supreme Court precedent] . . . ; that is, that state laws do not apply to national banks if they impermissibly contain a bank's exercise of a federally authorized power."). The OCC did not conduct its own review of specific potential conflicts on the ground. *See id.* It follows that the OCC's 2004 preemption regulation had no effect on the preemption standard prior to Dodd-Frank, which was governed by *Barnett Bank*.

In Dodd-Frank, Congress underscored that *Barnett Bank* continues to provide the preemption standard; that is, state consumer financial law is preempted *only if* it "prevents or significantly interferes with the exercise by the national bank of its powers," 12 U.S.C. § 25b(b)(1)(B).  Congress also made clear that only *Skidmore* deference applies to preemption determinations made by the OCC.**[5]**  *See id.* § 25b(b)(5)(A).  The OCC has recognized as much.  *See, e.g.*, 76 Fed. Reg. at 43557 (conceding that section 25b(b)(1)(B) "may have been intended to change the OCC's approach by shifting the basis of preemption back to the [*Barnett Bank*] decision itself").  Therefore, to the extent that the OCC has largely reaffirmed its previous preemption conclusions without further analysis under the *Barnett Bank* standard, *see* 76 Fed. Reg. at 43556, we give it no greater deference than before Dodd-Frank's enactment, as the standard applied at that time did not conform to *Barnett Bank*.  That is, the OCC's conclusions are entitled to little, if any, deference.

---

**[5]** That these provisions were among those that had a future effective date, *see* 124 Stat. at 2018, makes no difference to our analysis.  If we were to apply the "previous" NBA preemption standard and level of deference to OCC preemption determinations, we would apply, as explained above, the *Barnett Bank* standard and *Skidmore* deference required by the Dodd-Frank amendments.

Of course, a statute should be "so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant."  *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)).  But no such superfluity exists here where the effective date provision applies to the whole subtitle, which imposes other requirements upon the OCC, and not just the provisions clarifying the preemption and agency deference standards.  124 Stat. at 2018.  In fact, the OCC appears to have interpreted the effective date in just such a manner.  *See* 76 Fed. Reg. at 43557.

The one substantive change in the law that Dodd-Frank enacted was to require the OCC to follow certain procedures in making preemption determinations. Dodd-Frank mandates that all of the OCC's future preemption determinations be made "on a case-by-case basis, in accordance with applicable law." 12 U.S.C. § 25b(b)(1)(B). Under the "case-by-case basis" requirement, the OCC must individually evaluate state consumer laws *and* consult with the Bureau of Consumer Financial Protection before making any preemption determinations. 12 U.S.C. § 25b(b)(3). In addition, the OCC may not deem preempted a provision of a state consumer financial law "unless substantial evidence, made on the record of the proceeding, supports the specific finding regarding the preemption of such provision in accordance with [*Barnett Bank*]." 12 U.S.C. § 25b(c). Finally, the OCC must review its preemption determinations at least once every five years. 12 U.S.C. § 25b(d). These changes have no bearing here where the preemption determination is made by this court and not the OCC.

We now turn to the question of whether the NBA preempts California's escrow interest law.

## B. The NBA Does Not Preempt California's Escrow Interest Law

Under both *Barnett Bank* and Dodd-Frank, we must determine whether California Civil Code § 2954.8(a) "prevents or significantly interferes" with Bank of America's exercise of its national bank powers.[6]     As

---

[6] Ordinarily, affirmative defenses such as preemption may not be raised on a motion to dismiss except when the defense raises no disputed issues of fact. *Scott v. Kuhlmann*, 746 F.2d 1377, 1378 (9th Cir. 1984) (per curiam); *see also Rose v. Chase Bank USA, N.A.*, 513 F.3d 1032,

Congress provided in Dodd-Frank, the operative question is whether section 2954.8(a) *prevents* Bank of America from exercising its national bank powers or *significantly interferes* with Bank of America's ability to do so. *See* 12 U.S.C. § 25b(b)(1)(B). Minor interference with federal objectives is not enough. *Watters*, 550 U.S. at 11 ("[F]ederal control shields national banking from *unduly* burdensome and duplicative state regulation." (emphasis added)); *id.* at 12 ("[W]hen state prescriptions *significantly* impair the exercise of authority, enumerated or incidental under the NBA, the State's regulations must give way." (emphasis added)).

Applying that standard here, we hold that California Civil Code § 2954.8(a) is not preempted because it does not prevent or significantly interfere with Bank of America's exercise of its powers. Again, section 1639d(g)(3) of Dodd-Frank states, "If prescribed by applicable State or Federal law, each creditor shall pay interest to the consumer on the amount held in any . . . escrow account that is subject to this section in the manner as prescribed by that applicable State or Federal law." 15 U.S.C. § 1639d(g)(3). This language requiring banks to pay interest on escrow account balances "[i]f prescribed by applicable State [] law" expresses Congress's view that such laws would not necessarily

---

1038 n.4 (9th Cir. 2008) (declining to remand for further discovery because "no amount of discovery would change the central holding that Congress intended for the NBA to preempt [this] state restriction[] on national banks . . . ."). Such is the case here. Bank of America's arguments are purely legal and do not depend on resolution of any factual disputes over the effect of California law on the bank's business. Indeed, Bank of America confirms that "[n]o discovery is necessary . . . because this is a legal inquiry, not a factual one."

prevent or significantly interfere with a national bank's operations.

Dodd-Frank does not define the term "applicable." But the Supreme Court recently explained:

> "Applicable" means "capable of being applied: having relevance" or "fit, suitable, or right to be applied: appropriate." Webster's Third New International Dictionary 105 (2002). See also New Oxford American Dictionary 74 (2d ed. 2005) ("relevant or appropriate"); 1 Oxford English Dictionary 575 (2d ed. 1989) ("[c]apable of being applied" or "[f]it or suitable for its purpose, appropriate"). So an expense amount is "applicable" within the plain meaning of the statute when it is appropriate, relevant, suitable, or fit.

*Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 69 (2011); *see also Applicable*, Collins English Dictionary 97 (12th ed. 2014) ("being appropriate or relevant"); *Applicable*, Oxford Dictionaries (Oxford University Press), https://premium. oxford dictionaries.com/definition/american_english/ applicable (last visited Jan. 25, 2018) ("[r]elevant or appropriate"). Accordingly, "applicable" law in the context of section 1639d(g)(3) would appear to include any relevant or appropriate state laws that require creditors to pay interest on escrow account funds.

The inclusion of this term makes sense because not every state has escrow interest laws. In a regulation implementing Dodd-Frank's amendments to the TILA, the Consumer Financial Protection Bureau explained that:

[T]he creditor may be able to gain returns on the money that the consumers keep in their escrow account. Depending on the State, the creditor might not be required to pay interest on the money in the escrow account. The amount that the consumer is required to have in the consumer's escrow account is generally limited to two months' worth of property taxes and home insurance. However, some States require a fixed interest rate to be paid on escrow accounts, resulting in an additional cost to the creditors.

Escrow Requirements Under the Truth in Lending Act (Regulation Z), 78 Fed. Reg. 4726, 4747 (Jan. 22, 2013). Lusnak notes that only thirteen states appear to have escrow interest laws similar to California's. Through its requirement that creditors pay interest "in the manner as prescribed by" the relevant state law, Congress demonstrated an awareness of, and intent to address, the differences among state escrow interest laws. 15 U.S.C. § 1639d(g)(3). "[W]e may reasonably presume that Congress was aware of [existing law when it legislated]," *Do Sung Uhm v. Humana, Inc.*, 620 F.3d 1134, 1155 (9th Cir. 2010), and that it used the term "applicable" to refer to state escrow interest laws where they exist.[7]

---

[7] In so construing the term "applicable," we do not suggest that a state escrow interest law can *never* be preempted by the NBA. For example, a state law setting punitively high rates banks must pay on escrow balances may prevent or significantly interfere with a bank's ability to engage in the business of banking. We simply recognize that Congress's reference to "applicable State . . . law" in section 1639d(g)(3) reflects a determination that state escrow interest laws do not necessarily prevent or significantly interfere with a national bank's business.

Although we need not resort to legislative history, we note that it, too, confirms our interpretation of section 1639d(g)(3).   A House Report discusses how mortgage servicing, and specifically escrow accounts, contributed to the subprime mortgage crisis.  H.R. Rep. No. 111-94, at 53–56.  The Report notes that mortgage servicers are typically "large corporations" who "may . . . earn income from the float from escrow accounts they maintain for borrowers to cover the required payments for property insurance on the loan."  *Id.* at 55.  The Report's section-by-section analysis of Dodd-Frank then explains Congress's purpose behind section 1639d(g)(3), stating:

> Servicers must administer such accounts in accordance with the Real Estate Settlement Procedures Act (RESPA), [Flood Disaster Protection Act], and, if applicable, the law of the State where the real property securing the transaction is located, *including* making interest payments on the escrow account if required under such laws.

*Id.* at 91 (emphasis added).  This passage shows Congress's view that creditors, including large corporate banks like Bank of America, can comply with state escrow interest laws without any significant interference with their banking powers.

No legal authority supports Bank of America's position that California Civil Code § 2954.8(a) prevents or significantly interferes with the exercise of its powers.  Bank of America falls back on the OCC's pre-Dodd-Frank preemption rule, 12 C.F.R. § 34.4(a) (2004), but as we explained, Congress has since clarified that *Barnett Bank*'s preemption standard applies.  Bank of America's reliance on

the OCC's post-Dodd-Frank revision of section 34.4(a) also fails. Reading section 34.4(a) in isolation, Bank of America argues that state escrow interest laws necessarily prevent or significantly impair its real estate lending authority. However, the OCC's amendments specifically altered the language of section 34.4(b) to clarify that state laws "that [are] made applicable by Federal law" (which would include Dodd-Frank's TILA amendments) "are not inconsistent with the real estate lending powers of national banks . . . to the extent consistent with [*Barnett Bank*]." 12 C.F.R. § 34.4(b)(9) (2011).

All of Bank of America's cited cases are inapposite. *Flagg v. Yonkers Savings & Loan Association* concerned the Office of Thrift Supervision's ("OTS") authority to regulate federal savings associations, and the Second Circuit's holding in that case was based on the OTS's field preemption over the regulation of such associations. 396 F.3d 178, 182 (2d Cir. 2005). Unlike the OTS, the OCC does not enjoy field preemption over the regulation of national banks.[8] *Aguayo*, 653 F.3d at 921–22 ("[W]hile the OTS and the OCC regulations are similar in many ways . . . the OCC has explicitly avoided full field preemption in its rulemaking and has not been granted full field preemption by Congress."). *First Federal Savings and Loan Association of Boston v. Greenwald* also fails to support Bank of America's position. 591 F.2d 417 (1st Cir. 1979). *Greenwald* concerned a direct conflict between a state regulation requiring payment of interest on certain escrow accounts and a federal regulation expressly stating that no such obligation was to be imposed on federal savings associations "apart from the duties

---

[8] Nor does the OCC enjoy field preemption over the regulation of federal savings associations. 12 U.S.C. § 1465(b).

imposed by this paragraph" or "as provided by contract." *Id*. at 425. Here, there is no federal regulation that directly conflicts with section 2954.8(a).[9]

In sum, no legal authority establishes that state escrow interest laws prevent or significantly interfere with the exercise of national bank powers, and Congress itself, in enacting Dodd-Frank, has indicated that they do not. Accordingly, we hold that the NBA does not preempt California Civil Code § 2954.8(a).

## C.  Lusnak's Claims For Relief

We turn now to Lusnak's two claims for relief. Using the UCL as a procedural vehicle, Lusnak alleges that Bank of America violated both state law, Cal. Civ. Code § 2954.8(a), and federal law, 15 U.S.C. § 1639d(g)(3), by failing to pay interest on his escrow account funds. *See Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1130 (9th Cir. 2014) ("In prohibiting 'any unlawful' business practice, the UCL 'borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable.'"). Lusnak also brings a state-law breach of contract claim, alleging that Bank of America's failure to pay interest violated his mortgage agreement.

---

[9] Bank of America's district court authorities are nonbinding and unpersuasive. *See Hayes v. Wells Fargo Bank, N.A.*, No. 13cv1707 L(BLM), 2014 WL 3014906 (S.D. Cal. Jul. 3, 2014); *Wis. League of Fin. Insts., Ltd. v. Galecki*, 707 F. Supp. 401 (W.D. Wis. 1989). As in *Flagg*, the court in *Hayes* based its holding on the OTS's field preemption over the regulation of federal savings associations. 2014 WL 3014906, at *5. And *Galecki* concerned the regulatory authority of the Federal Home Loan Bank Board, which was "*preemptive of any state law purporting to address the subject of the operations of a Federal [savings] association.*" 707 F. Supp. at 404 (quoting 12 C.F.R. § 545.2).

Bank of America—failing to distinguish between Lusnak's state and federal theories—argues that his UCL claim cannot proceed because his escrow account was created before section 1639d's effective date of January 21, 2013. 124 Stat. at 2136. We agree that Lusnak cannot rely on section 1639d in prosecuting his UCL claim. Section 1639d mandates that creditors establish escrow accounts in connection with certain mortgages. *See* 15 U.S.C. § 1639d(a)–(b). Specifically, section 1639d(a) states that "a creditor, in connection with the consummation of a consumer credit transaction secured by a first lien on the principal dwelling of the consumer . . . *shall establish, before the consummation of such transaction*, an escrow or impound account . . . *as provided in, and in accordance with, this section*." 15 U.S.C. § 1639d(a) (emphasis added). The use of prospective language, specifically "shall establish, before the consummation of such transaction," indicates that Congress intended the detailed requirements in section 1639d to apply to accounts established pursuant to that section after it took effect in 2013.

Moreover, section 1639d(g)(3) requires creditors to pay interest under "applicable" state law on funds in federally mandated escrow accounts that are "subject to this section." 15 U.S.C. § 1639d(g)(3). Lusnak's escrow account was not a federally mandated account "subject to" section 1639d at the time it was created because it was established before that section took effect in 2013. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("[C]ongressional enactments . . . will not be construed to have retroactive effect unless their language requires this result.").

However, these conclusions do not preclude Lusnak from obtaining relief under the UCL. Because California Civil Code § 2954.8(a) is not preempted, Bank of America

was required to follow that law, and Lusnak may proceed on his UCL claim on the theory that Bank of America violated the UCL by failing to comply with section 2954.8(a). The parties argue over when exactly Bank of America's obligation to comply with section 2954.8(a) might have begun. Given that the *Barnett Bank* standard applied both pre- and post-Dodd Frank, the preemption analysis is the same in both time periods. Therefore, because section 2954.8(a) was not preempted when Bank of America assumed control over Lusnak's pre-existing escrow account, Bank of America's obligation to pay interest on any funds in Lusnak's escrow account was triggered from that point forward.

Lusnak may also proceed on his breach of contract claim. Lusnak's mortgage documents require Bank of America to pay escrow interest if "Applicable Law requires interest to be paid on the Funds." The mortgage defines "Applicable Law" as "all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions." Accordingly, on the allegations in the complaint, a jury could find that the "Applicable Law" provision of the contract also requires that Bank of America pay interest on funds in Lusnak's escrow account.

## IV.  Conclusion

For the reasons set forth above, we **REVERSE** and **REMAND** the case for further proceedings consistent with this Opinion.