**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SUSAN MCSHANNOCK, as Executrix of the Estate of Patricia Blaskower, on behalf of the Estate of Patricia Blaskower and all others similarly situated; MONICA CHANDLER, as Trustee of the Chandler Family Trust, and all others similarly situated; MOHAMED MEKY, and all others similarly situated,
*Plaintiffs-Appellees*,

v.

JP MORGAN CHASE BANK NA, doing business as Chase Bank,
*Defendant-Appellant.*

No. 19-15899

D.C. No.
3:18-cv-01873-EMC

OPINION

Appeal from the United States District Court
for the Northern District of California
Edward M. Chen, District Judge, Presiding

Argued and Submitted May 13, 2020
San Francisco, California

Filed September 22, 2020

Before:  J. Clifford Wallace and Ryan D. Nelson, Circuit
Judges, and James S. Gwin,[*] District Judge.

Opinion by Judge R. Nelson;
Dissent by Judge Gwin

---

**SUMMARY**[**]

---

### Home Owners' Loan Act / Preemption

The panel reversed the district court's order denying JP
Morgan Chase Bank N.A.'s motion to dismiss, and held that
California's law requiring the payment of interest on escrow
accounts was preempted by the Home Owners' Loan Act of
1933 ("HOLA"), and its implementing regulations.

Plaintiffs obtained residential home mortgages from
Washington Mutual Bank, FA, a federal savings association
organized and regulated under HOLA.  Chase Bank, a
national bank organized and regulated under the National
Bank Act, assumed all of Washington Mutual's mortgage
servicing rights and obligations.  Through HOLA, Congress
vested the Office of Thrift Supervision ("OTS") with broad
authority to shape the regulatory environment for federal
savings associations.

---

[*] The Honorable James S. Gwin, United States District Judge for the
Northern District of Ohio, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It
has been prepared by court staff for the convenience of the reader.

The panel held that HOLA field preemption principles applied to plaintiffs' claims against Chase, a national bank, even though its conduct giving rise to the complaint occurred after it acquired the loans in question from Washington Mutual, a federal savings association. Because California's interest-on-escrow law imposed a requirement regarding escrow accounts; affected the terms of sale, purchase, investment in, and participation in loans originated by savings associations; and had more than an incidental effect on the lending operations of savings associations, the panel held that it was preempted by 12 C.F.R. § § 560.2(b)(6) and (b)(10), and 560.2(c) of the OTS regulation governing this case.

District Judge Gwin dissented because the majority opinion reached a conclusion not supported by the statute's and regulation's text, and because California was not otherwise preempted from requiring banks to pay nominal interest on escrow account balances.

## COUNSEL

Alan E. Schoenfeld (argued), Noah A. Levine, and Alexandra Hiatt, Wilmer Cutler Pickering Hale and Dorr LLP, New York, New York; David C. Powell and Alexander J. Gershen, McGuire Woods LLP, San Francisco, California; Brian D. Schmalzbach, McGuire Woods LLP, Richmond, Virginia; Nellie E. Hestin, McGuire Woods LLP, Pittsburgh, Pennsylvania; for Defendant-Appellant.

Glenn A. Danas (argued), Robins Kaplan LLP, Los Angeles, California; Michael F. Ram and Marie Appel, Robins Kaplan LLP, Mountain View, California; Michael J. Pacelli, Robins Kaplan LLP, Minneapolis, Minnesota; Samuel J.

Strauss, Turke & Strauss LLP, Madison, Wisconsin; Harold Jaffe, Dublin, California; for Plaintiffs-Appellees.

H. Rodgin Cohen, Matthew A. Schwartz, Corey Omer, and Y. Carson Zhou, Sullivan & Cromwell LLP, New York, New York; Gregg L. Rozansky, The Bank Policy Institute, Washington, D.C.; Thomas Pinder, The American Bankers Association, Washington, D.C.; Steven P. Lehotsky and Janet Galeria, U.S. Chamber Litigation Center, Washington, D.C.; for Amici Curiae The Bank Policy Institute, The American Bankers Association, and Chamber of Commerce of the United States of America.

Scott L. Nelson and Allison M. Zieve, Public Citizen Litigation Group, Washington, D.C., for Amicus Curiae Public Citizen Litigation Group.

Xavier Becerra, Attorney General; Nicklas A. Akers, Senior Assistant Attorney General; Michele Van Gelderen, Supervising Deputy Attorney General; Rachel A. Foodman, Deputy Attorney General; Office of the Attorney General, San Francisco, California; for Amicus Curiae State of California.

**OPINION**

R. NELSON, Circuit Judge:

This case requires us to decide whether mortgagors are entitled, under California law, to interest on escrow accounts for mortgages that were issued by a savings association and later assigned to a national bank. We hold that California's law requiring the payment of interest on escrow accounts is preempted by the Home Owners' Loan Act of 1933 ("HOLA"), 12 U.S.C. § 1461 *et seq.*, and its implementing regulations, even where the mortgage is assigned from a savings association to a national bank.

**I**

Between 2005 and 2007, the Chandler Family Trust,[1] Mohamed Meky, and Patricia Blaskower[2] (collectively, "Appellees") obtained residential home mortgages from Washington Mutual Bank, FA ("WaMu"). Appellees, whose homes were located in California, would normally have been entitled to "at least 2 percent simple interest per annum" on any funds held in escrow under California Civil Code Section 2954.8 (hereinafter, "California's interest-on-escrow law"). But WaMu, a federal savings association organized and regulated under HOLA, was not required to pay Appellees interest because HOLA and its implementing

---

[1] Monica Chandler is the trustee of the Chandler Family Trust and one of the named plaintiffs in this case.

[2] Susan McShannock, the lead named plaintiff in this case, is the executrix of the Estate of Patricia Blaskower.

regulations preempted California law.[3]  Thus, Appellees did not receive interest on their escrow accounts while WaMu held the loans.

WaMu failed during the 2008 financial crisis and was placed in the Federal Deposit Insurance Corporation's ("FDIC") receivership.  The FDIC sought buyers for WaMu's assets, eventually coming to terms with Appellant JP Morgan Chase Bank NA ("Chase").  Under the terms of the agreement, Chase assumed "all mortgage servicing rights and obligations" of WaMu.  Unlike WaMu, which was organized and regulated under HOLA, Chase is a national bank organized and regulated under the National Bank Act ("NBA"), 12 U.S.C. § 38, *et seq*.

---

[3] The parties cite 12 C.F.R. § 560 and its subsections throughout their briefs.  After the parties filed their Opening and Answering briefs, a rule promulgated by the Department of the Treasury took effect removing all regulations promulgated by the now-defunct Office of Thrift Supervision ("OTS") from the Code of Federal Regulations. *See* Removal of Office of Thrift Supervision Regulations, 82 Fed. Reg. 47083-02 (Oct. 11, 2018).  The Treasury Department's rule, pursuant to Dodd-Frank Wall Street Reform and Consumer Protection Act (hereinafter, the "Dodd-Frank Act"), recognized that section 560's field preemption scheme had been replaced by rules promulgated by the Office of the Comptroller of the Currency ("OCC"). *Id.*  The current regulation provides that, "[s]tate law applies to the lending activities of Federal savings associations and their subsidiaries to the same extent and in the same manner that those laws apply to national banks and their subsidiaries."  12 C.F.R. § 160.2.  The parties agree, however, that section 560 provides the rule of decision for this case because it was the operative rule at the time Appellees obtained their mortgages. *See* 12 U.S.C. § 5553 (provision of the Dodd-Frank Act mandating that the Act "shall not be construed to alter or affect the applicability of any regulation . . . [issued] by . . . the Director of the Office of Thrift Supervision . . . on or before July 21, 2010.").

We recently held in *Lusnak v. Bank of America, N.A.*, 883 F.3d 1185, 1188 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 567 (2018), that the NBA does not preempt California's interest-on-escrow law. Appellees filed a consolidated class action complaint against Chase shortly after our decision in *Lusnak* was issued, seeking to represent a class of:

> [a]ll mortgage loan customers of Chase (or its subsidiaries), whose mortgage loan is for a one-to-four family residence located in California, and who paid Chase money in advance for payment of taxes and assessments on the property, for insurance, or for other purposes relating to the property, and to whom Chase failed to pay interest as required by Cal. Civ. Code § 2954.8(a).

Chase then moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). Chase argued that because Appellees' mortgages were initially issued by WaMu—a federal savings association organized and regulated under HOLA—Chase was not required to pay Appellees interest even though Chase is a national bank organized and regulated under the NBA. The district court denied the motion. The district court held that although the mortgages were issued by WaMu, HOLA preemption no longer applied because the Appellee's complaint sought redress only for Chase's nonpayment of escrow interest after it acquired WaMu's assets.

Chase requested interlocutory appeal of the district court's denial of its motion to dismiss. The district court granted the request, and we granted Chase's permission to proceed with the interlocutory appeal. We have jurisdiction under 28 U.S.C. § 1292(b), and we reverse.

## II

We review de novo a district court's denial of a motion to dismiss for failure to state a claim under Rule 12(b)(6). *See Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 690 (9th Cir. 2011) (citation omitted).  All allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party.  *Id.* (citation omitted).  A district court may dismiss a complaint only if it fails to state "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Questions of statutory interpretation are reviewed de novo . . . as are questions of preemption." *Lopez v. Wash. Mut. Bank*, 302 F.3d 900, 903 (9th Cir. 2002) (internal citation omitted).

## III

## A

Through HOLA, Congress vested the OTS[4] with "broad authority" to shape the regulatory environment for federal savings associations.  *Silvas v. E\*Trade Mortg. Corp.*, 514 F.3d 1001, 1004–05 (9th Cir. 2008)*.* Consistent with congressional intent, the OTS decided in 1996 to "occup[y]

---

[4] Regulatory responsibility for HOLA has changed hands twice since the statute was adopted in 1933.  First, responsibility passed from the Federal Home Loan Bank Board ("FHLBB") to the OTS in 1989. *See* Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. No. 101–73, § 201, 103 Stat. 183, 201.  Responsibility then passed from the OTS to the OCC in 2011. *See* Dodd-Frank Act, Pub. L. No. 111–203, § 312, 124 Stat. 1376 (2010).  Our analysis is limited to the regulatory decisions of the OTS and, to the extent they remained in force, the FHLBB.

the entire field of lending regulation for federal savings associations." 12 C.F.R. § 560.2. In doing so, the OTS:

> intend[ed] to give federal savings associations maximum flexibility to exercise their lending powers in accordance with a uniform federal scheme of regulation. Accordingly, federal savings associations may extend credit as authorized under federal law . . . without regard to state laws purporting to regulate or otherwise affect their credit activities.

*Id.*

The specific question before us is whether HOLA preempts California's interest-on-escrow law for loans issued by WaMu between 2005 and 2007 that were later assigned to Chase.[5] We have observed that "[w]hether, and to what extent, HOLA applies to claims against a national bank when that bank has acquired a loan executed by a federal savings association is an open question" in our court. *Campidoglio LLC v. Wells Fargo & Co.*, 870 F.3d 963, 970–71 (9th Cir. 2017). We resolve that question in this appeal.

Federal district courts that have addressed the question have taken three different positions: (1) HOLA preemption

---

[5] Chase also argues that the plain terms of the parties' mortgage agreement preclude Appellees from collecting interest on their escrow accounts. Because we conclude California's interest-on-escrow law is preempted by HOLA, we do not need to reach that question. We also do not decide what, if any, relevancy the "valid-when-made" doctrine has in deciding this case. Professor Adam Levitin offers to "gladly withdraw his motion [to file a late amicus brief] and tentatively filed brief," addressing this issue, and we therefore deny his motion as moot.

applies to all conduct connected to a loan originating with a federal savings association; (2) HOLA preemption necessarily does not apply to national banks; and (3) whether HOLA preemption applies depends on whether the claims arise from the conduct of the federal savings association or of the national bank. *See, e.g.*, *Kenery v. Wells Fargo Bank, N.A.*, No. 5:13-CV-02411-EJD, 2014 WL 129262, at \*4 (N.D. Cal. Jan. 14, 2014). The district court adopted the third approach, and Chase asks us to adopt the first approach.

To resolve this dispute, we begin with the text of HOLA, its amendments, and the regulations implemented pursuant to HOLA. Appellees point out that OTS's regulations "occup[y] the entire field of lending regulation for federal savings associations." 12 C.F.R. § 560.2(a). Focusing on this language, Appellees assert that HOLA preemption does not apply to the complaint in this case, which exclusively implicates the conduct of Chase, a national bank. We disagree.

The OTS's preemption regulation is not so limited in scope to cover only the conduct of a federal savings association. Section 560.2(a) provides that "OTS is authorized to promulgate regulations that preempt state laws *affecting the operations* of federal savings associations when deemed appropriate . . . ." *Id.* (emphasis added).[6] Section

_____

[6] We agree section 560.2(a) "only preempts a state law when the state law affects *federal savings association operations*." Dissent at 34 (emphasis in original). We diverge with the dissent, however, in its unnecessarily narrow interpretation of what affects operations. As we note below, *see infra* Section III(C), failure to preempt state law burdening the sale of these mortgages inevitably would directly affect federal savings associations operations. We also agree "[t]he regulation's preemption language limited preemption to lending regulation and to federal savings associations." Dissent at 35. But we

560.2(a) also states that the "OTS intends to give federal savings associations *maximum flexibility* to exercise their lending powers in accordance with a uniform federal scheme of regulation." *Id.* (emphasis added). Applying the plain meaning of the OTS's preemption regulation, we hold that field preemption principles extend to all state laws affecting a federal savings association, without reference to whether the conduct giving rise to a state law claim is that of a federal savings association or of a national bank.

In addition, in 1982, the FHLBB, the precursor to the OTS, implemented a regulation preempting "any state law purporting to address the subject of a Federal association's ability or right to . . . sell" mortgages or "directly or *indirectly* to restrict such ability or right." 12 C.F.R. § 545.6(a)(2) (emphasis added). When the OTS promulgated its own field preemption regulation, OTS "confirm[ed] and carr[ied] forward its existing preemption position," OTS Final Rule, 61 Fed. Reg. 50,951, 50,965 (Sept. 30, 1996), and "restate[d] long-standing preemption principles applicable to federal savings associations, as reflected in earlier regulations, court cases, and numerous opinions issued by OTS and the [FHLBB]," *id.* at 50,952.

We defer to the FHBLBB and the OTS's "broad authority to issue regulations governing thrifts." *Silvas*, 514 F.3d at 1005. Significantly, those regulations have "no less preemptive effect than federal statutes." *Id*. Thus, the

---

do not reach our conclusion today because of any impact California's law has on *national banks*. Instead, our holding is based solely on the effect California's law has had and will have on financial savings associations and the mortgages they have acquired and may sell.

text of HOLA and the OTS regulations support applying field preemption here.

The district court correctly observed that "at the time HOLA was enacted in 1933, nothing in its text or legislative history expressly indicated Congress expected that federal savings associations would sell their residential mortgage loans on a secondary market to entities not governed by HOLA, much less intended for HOLA preemption to attach to any such loans." But although there is nothing in the text or the legislative history of HOLA that references the transfer of loans from a federal savings association in a secondary market, the district court erred by discounting the subsequent amendments to HOLA and the OTS's regulations.[7] Indeed, the United States Supreme Court has rejected the narrow interpretive approach that the district

---

[7] We agree "a federal agency may pre-empt state law only when and if it is acting within the scope of its congressionally delegated authority." Dissent at 32, 33 n.15 (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)). But we see no delegation issue here. HOLA, as amended in 1989, delegated authority to OTS to "provide for the examination, safe and sound operation, and regulation of savings associations" and to "issue such regulations as [OTS] determines to be appropriate[.]" 12 U.S.C. §§ 1463(a)(1)–(2) (1989), *amended by* 12 U.S.C. § 1463 (2010). More specifically, OTS was to "exercise all powers granted . . . so as to *encourage* savings associations to provide credit for housing safely and soundly." *Id.* § 1463(a)(3) (emphasis added); *see also* 12 U.S.C. § 1464(a) ( "The lending and investment powers conferred by this section are intended to *encourage* such institutions to provide credit for housing safely and soundly.") (emphasis added). As the sale and transfer of mortgages impacts the economic health and viability of federal savings associations, *see infra* Section III(C), failing to extend HOLA's preemptive effect to these transfers would discourage savings associations to provide credit for housing. Thus, applying OTS regulations to the sale and transfer of pre-2011 mortgages falls within OTS's delegated authority, even if those mortgages are now held by national banks.

court adopted.  *See Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 154 (1982) ("A pre-emptive regulation's force does not depend on express congressional authorization to displace state law . . . . Thus, the [lower court's] *narrow focus on Congress' intent to supersede state law was misdirected*.  Rather, the questions upon which resolution of this case rests are whether the Board meant to pre-empt California's [] law, and, if so, whether that action is within the scope of the Board's delegated authority." (emphasis added)).

HOLA's subsequent amendment and the OTS regulations support applying field preemption here. Although a secondary market for mortgage loans did not exist at the time HOLA was adopted in 1933, Congress created the Federal National Mortgage Association ("Fannie Mae") in 1938, thereby establishing a secondary market for loans.  *See* National Housing Act Amendments of 1938, ch. 13, 52 Stat. 23.  Congress expanded the secondary market for loans in 1970 by creating the Federal Home Loan Mortgage Corporation ("Freddie Mac").  *See* H.R. Rep. No. 91-1311, at 4 (1970); *see also* S. Rep. No. 91-761, at 1 (1970).  Finally, in 1978 Congress amended HOLA to allow savings associations to sell loans into the secondary market. *See* Act of Nov. 10, 1978, Pub. L. No. 95-630, § 1701, 92 Stat. 3641, 3714 (1978).  Thus, there is little doubt that Congress intended HOLA to cover the sale of mortgages belonging to federal savings associations.  *de la Cuesta*, 458 U.S. at 163.  We therefore hold that HOLA preemption principles extend to a situation where, as here, a loan originates from a federal savings association, but the state purports to regulate the conduct of a non-federal savings association, such as a national bank, over that same loan.

**B**

We now turn to and apply the established HOLA preemption framework. To guide banking institutions and state legislatures about the contours of HOLA's field preemption, the OTS established a tripartite scheme. First, section 560.2(a) provided that: "[t]o enhance safety and soundness and to enable federal savings associations to conduct their operations in accordance with best practices (by efficiently delivering low-cost credit to the public free from undue regulatory duplication and burden), OTS hereby occupies the entire field of lending regulation for federal savings associations." 12 C.F.R. § 560.2(a). Second, in section 560.2(b), the OTS provided "[i]llustrative examples" of the "types of state laws preempted" by HOLA, including "laws purporting to impose requirements regarding," "[e]scrow accounts" and the "[p]rocessing, origination, servicing, sale, or purchase of, or investment or participation in, mortgages." 12 C.F.R. § 560.2(b), (b)(6), (b)(10). Finally, in the event a state law was not among the illustrative examples listed in section 560.2(b), OTS preempted any state law having more than an "incidental effect on the lending operations of" federal savings associations. 12 C.F.R. § 560.2(c)(6)(ii).

A three-step process governs our inquiry. *See Silvas*, 514 F.3d at 1005.

> The first step . . . [is] to determine whether the type of law in question is listed in paragraph [560.2](b). If so, the analysis will end there; the law is preempted. If the law is not covered by paragraph (b), the next question is whether the law affects lending. If it does, then, in accordance with paragraph [560.2](a), the presumption arises that the

law is preempted. This presumption can be reversed only if the law can clearly be shown to fit within the confines of paragraph [560.2](c). For these purposes, paragraph (c) is intended to be interpreted narrowly. Any doubt should be resolved in favor of preemption.

*Id.* (quoting OTS, Final Rule, 61 Fed. Reg. 50,951, 50,966–67 (Sept. 30, 1996)). In applying this framework, we are "not limited to assessing whether the state law on its face comes within paragraph (b) of the regulation." *Campidoglio*, 870 F.3d at 971–72. "Instead, we ask whether the state law, 'as applied, is a type of state law contemplated in the list under paragraph (b) . . . . If it is, the preemption analysis ends.'" *Id.* at 972 (quoting *Silvas*, 514 F.3d at 1006).

We therefore first turn to the question whether California's interest-on-escrow law is preempted by sections 560.2(b)(6) and 560.2(b)(10). Section 560.2(b)(6) preempts state laws "purporting to impose requirements regarding . . . escrow accounts." 12 C.F.R. § 560.2(b)(6). California's interest-on-escrow law requires the payment of "at least 2 percent simple interest per annum" on funds held in escrow. Cal. Civ. Code § 2954.8(a). This is certainly a "requirement[] regarding . . . escrow accounts" under section 560.2(b)(6). Thus, California's interest-on-escrow law is preempted. *See Silvas*, 514 F.3d at 1006 (holding that claims for unfair advertising and unfair competition brought pursuant to California's consumer protection statute were preempted by § 560.2(b)(9)).

Applying section 560.2(b)(10) to California's interest-on-escrow law yields the same result. Section 560.2(b)(10)

preempts state laws "purporting to impose requirements regarding . . . [the] [p]rocessing, origination, servicing, sale or purchase of, or investment or participation in, mortgages." 12 C.F.R. § 560.2(b)(10).  We agree with Chase that a state law, such as California's interest-on-escrow law, that directly or indirectly imposes conditions on a federal savings association's ability to convey a loan is preempted under HOLA.  Thus, California's interest-on-escrow law is also preempted by section 560.2(b)(10) because it affects the sale, purchase of, investment in, and participation in loans originated by savings associations.

## C

We need not go further because California's interest-on-escrow law is "the type of law in question in paragraph 560.2(b)." *Silvas*, 514 F.3d at 1005 (cleaned up).  "So, the analysis ends there; the law is preempted." *Id*. (cleaned up). But section 560.2(c) preempts California's interest-on-escrow law as well, because application of the law would have more than an "incidental effect on the lending operations of" savings associations.

After Congress amended HOLA in 1978, federal savings associations developed a common lending cycle.  A mortgagor, like Appellees here, applies for a mortgage at a savings association.  The federal savings association extends the mortgagor funds to purchase the property, in exchange for future interest payments.  Rather than wait to collect those interest payments, however, the federal savings association exchanges the original mortgage for a mortgage backed security from Fannie Mae or Freddie Mac.  The federal savings association then sells this mortgage backed security to investors on the secondary market.  Finally, the savings association takes the funds generated by the sale of the mortgage backed security and uses them to fund

additional loans to new mortgagors.  A simplified version of this process follows.



Fannie Mae, *Basics of Fannie Mae Single-Family MBS* (Oct. 2019), https://www.fanniemae.com/resources/file/mbs/pdf/basics-sf-mbs.pdf (last accessed Aug. 6, 2020).

A central component of this cycle is the ability of federal savings associations to securitize the original loans and sell them into the secondary market.  As the Supreme Court explained in *de la Cuesta*, the "marketability of a mortgage

in the secondary market is *critical* to a savings and loan, for it thereby can sell mortgages to obtain funds to make additional home loans."  458 U.S. at 155 n.10 (emphasis added).  In 2009, "82 percent of the first-lien home-purchase and refinance loans for one- to four-family properties . . . were sold during the year."  Robert B. Avery et al., *The 2009 HMDA Data: The Mortgage Market in a Time of Low Interest Rates and Economic Distress*, Fed. Reserve Bulletin, A45 (Dec. 2010), https://www.federalreserve.gov/ pubs/bulletin/2010/pdf/2009_HMDA_final.pdf (last accessed Aug. 6, 2020).

Allowing states to impose a panoply of requirements on loans originated by savings associations impedes the securitization of those loans by (1) creating substantial uncertainty for buyers in the secondary market about the applicable law governing the loans they are purchasing and (2) imposing substantial compliance costs on secondary buyers.  *See* R. H. Coase, *The Problem of Social Cost*, 56 J.L. & Econ. 837, 850 (2013) (observing that transaction costs are frequently sufficient to "prevent many transactions that would be carried out in a world in which the pricing system worked without cost").  This, in turn, decreases the value of the loans being held by federal savings associations, thereby reducing the amount of lending federal savings institutions can do.  *See de la Cuesta*, 458 U.S. at 155 n.10. We hold that this result more than "incidentally effect[s] . . . the lending operations of" savings associations, which triggers preemption under section 560.2(c).

Our conclusion is supported by a natural experiment that took place in the Second Circuit in the wake of *Madden v. Midland Funding, LLC*, 786 F.3d 246 (2d Cir. 2015).  *See In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239, 1250 (9th Cir. 2020)

(crediting the results of natural experiments in reaching the conclusion that an increase in compensation to student athletes did not diminish consumer demand).  In *Madden*, the Second Circuit held that the NBA did not preempt application of New York state's usury law to loans that were originally issued by national banks and then sold into the secondary market.  786 F.3d at 251–52.

In the wake of *Madden*, the secondary market "significantly reduced the price of notes backed by above-usury loans to borrowers in Connecticut and New York." Colleen Honigsberg et al., *How Does Legal Enforceability Affect Consumer Lending? Evidence from A Natural Experiment*, 60 J.L. & Econ. 673, 675 (2017).  Lenders also extended "relatively less credit to borrowers" and "discount[ed] notes backed by above-usury loans to borrowers in Connecticut and New York."  *Id.* at 675, 691. "Not only did lenders make smaller loans in these states after *Madden*, but they also declined to issue loans to the higher-risk borrowers most likely to borrow above usury rates."  *Id.* at 675; *see also* Piotr Danisewicz & Ilaf Elard, *The Real Effects of Financial Technology: Marketplace Lending and Personal Bankruptcy* 22 (2018), https://tinyurl.com/y5s3s7 oh (noting a 64% decrease in the volume of lending to low-income households in the wake of *Madden*).[8]

Even before *Madden* started to impact the market, many questioned its reasoning, including the United States.  *See*

---

[8] We disagree the study's findings are inapposite.  *See* Dissent at 40. While the study found that discount for notes backed by noncurrent loans were "highly economically meaningful," discounts for current loans were also statistically significant.  Honigsberg et al., *supra*, at 675. Moreover, the study unequivocally found lenders extended "relatively less credit to borrowers" and "declined to issue loans to higher-risk borrowers most likely to borrow above usury rates."  *Id.*

Brief for the United States as Amicus Curiae at *1, *Midland Funding, LLC v. Madden*, 786 F.3d 246 (2d Cir. 2015) (No. 15-610), 2016 WL 2997343. The United States explained why *Madden* was "incorrect":

> Properly understood, a national bank's Section 85 authority to charge interest up to the maximum permitted by its home State encompasses the power to convey to an assignee the right to enforce the interest rate term of the agreement. That understanding is reinforced by 12 U.S.C. 24(Seventh), which identifies the power to sell loans as an additional power of national banks. The court of appeals appeared to conclude that, so long as application of New York usury law to petitioners' collection activities would not entirely prevent national banks from selling consumer debt, state law is not preempted. That analysis reflects a misunderstanding of Section 85 and of this Court's precedents.

*Id.* at *6 (internal quotation marks omitted).

Basic economic principles, the natural experiment that took place in the wake of *Madden*, and the persuasive arguments put forth by the United States convince us that enforcing California's interest-on-escrow law would reduce the value of the loans and reduce lending by savings associations, particularly to high-risk borrowers. *Id.* This is more than the "incidental effect" required by section 560.2(c) to trigger HOLA preemption, particularly in light

of our rule that "[a]ny doubt should be resolved in favor of preemption." *Silvas*, 514 F.3d at 1005.[9]

## D

Appellees and amici's arguments and the case law on which they rely do not compel a different conclusion.

First, Appellees argue "that [the plain text of] § 560.2(a) limits the field of preemption to lending activities of *federal savings associations*." Appellees contend that this necessarily bars a national bank like Chase from benefiting from HOLA preemption. But by focusing solely on the term "federal savings association" at the exclusion of the rest of section 560.2's text, Appellees miss the forest for the trees. *See McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819) (per Marshall, C.J.) (observing that interpretation requires considering "the whole instrument").

As we have discussed, *supra* Section III(C), applying California's interest-on-escrow law would the impose requirements on the "[p]rocessing, origination, servicing, sale or purchase of, or investment or participation in, mortgages," *contra* § 560.2(b)(10), while at the same time having more than an "incidental[] effect [on] . . . the lending

---

[9] Appellees argue in a footnote that resolution of this case at the motion to dismiss phase is inappropriate because Chase relies "on the speculative effect of non-preemption on FSAs, a factual issue very much in dispute." Although we agree with the general principle that affirmative defenses may not be raised on a motion to dismiss, *see ASARCO, LLC v. Union Pac. R.R. Co.*, 765 F.3d 999, 1004 (9th Cir. 2014), we have previously decided whether the NBA or the HOLA preempts a state law at the motion to dismiss phase. *See Rose v. Chase Bank USA, N.A.*, 513 F.3d 1032, 1038 (9th Cir. 2008); *Silvas*, 514 F.3d at 1008 (affirming the district court's decision to grant a motion to dismiss on the basis of HOLA preemption).

operations of" savings associations, *contra* § 560.2(c).   A simple hypothetical demonstrates why Appellees' cramped interpretation of section 560.2 fails.  Say California adopted a two-part statute.  The first part allows "federal savings associations to sell their loans to third-parties."  The second part provides that "third-parties who purchase said loans may be punished by up to one year in prison."   Under Appellees' interpretation of section 560.2, HOLA would not preempt the second part of the statute because the statute does not *directly regulate* savings associations, even though it obviously affects the market for savings association loans. This interpretation of section 560.2 would create a sweeping opportunity for states to make an end run around HOLA preemption.   We doubt Congress or the administering agencies intended HOLA's preemptive force to be so feeble.

Second, the case on which Appellees primarily rely, *Lusnak*, does little to support their position.  In *Lusnak*, we held that the NBA's conflict preemption regime did not preempt California's interest-on-escrow law.  883 F.3d at 1197.   But preemption under the NBA is triggered only where the state law at issue "prevent[s] or significantly interfere[s] with the exercise of national bank powers."  *Id.* Preemption under HOLA, by contrast, is triggered at a much lower threshold—whenever a state law is the type of law contemplated by section 560.2(b) or has more than an "incidental effect on the lending operations of" savings associations, § 560.2(c).  *Lusnak*'s holding that preemption did not apply under the NBA's standard therefore says little about whether preemption applies under HOLA's less onerous standard.

Finally, we disagree that applying field preemption would run afoul of a primary purpose of HOLA: consumer protection.   Although there is ordinarily a presumption

against preemption in the context of consumer protection statutes like California's interest-on-escrow law, this case involves field preemption of a sweeping federal law. *See Lusnak*, 883 F.3d at 1196. HOLA field preemption is so broad that the traditional presumption against preemption does not apply. *See Silvas*, 514 F.3d at 1004. We have described "HOLA and its following agency regulations as a 'radical and comprehensive response to the inadequacies of the existing state system,' and 'so pervasive as to leave *no room for state regulatory control.*'" *Id.* (quoting *Conference of Fed. Sav. & Loan Ass'ns v. Stein*, 604 F.2d 1256, 1257, 1260 (9th Cir. 1979) (emphasis added)). Thus, because of this "history of significant federal presence . . . the presumption against preemption of state law is inapplicable." *Id.* at 1005.

## E

Our holding also accords with the view of HOLA preemption expressed in two agency opinion letters.[10] In 1985, the FHLBB was asked to evaluate whether HOLA preemption extended to a "New York State law requiring the payment of interest on escrow accounts." FHLBB Op. General Counsel, 1985 FHLBB LEXIS 178, at *1 (Aug. 13, 1985). The FHLBB observed that HOLA preempted "state laws or regulations which would impose upon federal associations obligations to pay interest on escrow accounts

---

[10] The parties contest the level of deference we owe to these letters. We need not resolve this dispute because the text and history of HOLA and OTS's preemption regulation is sufficient for our holding. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) ("[A] court must carefully consider the text, structure, history, and purpose of a regulation, in all the ways it would if it had no agency to fall back on. Doing so will resolve many seeming ambiguities out of box, without resort to *Auer* deference.").

other than those provided for in their loan contracts."  *Id.* at *4.  Taking this analysis one step further, the FHLBB opined that "such preemption would exist regardless of whether the loans in question are sold by the federal association *to a third party*, are being serviced by a third party, or whether the escrow deposits are held at a federal association while the loans have been sold in the secondary market." *Id.* at *5 (emphasis added).[11]

The FHLBB's 1985 letter was cited by the OTS in a second opinion letter issued seventeen years later.  *See* Preemption of N.J. Predatory Lending Act, OTS Op. Letter, P-2003-5, 2003 WL 24040104, at *4 n.18 (July 22, 2003). In 2003, the OTS was asked to address whether "purchasers or assignees of loans a federal savings association originates would be subject to claims and defenses that would not apply to the federal savings association itself." *Id.* at *1. Answering this question in the negative, the OTS first opined that purchasers, pursuant to the NJ Act itself, would not be liable. *Id.* at *4.  The OTS added that "this result would be consistent with the general principle that loan terms should not change simply because an originator entitled to federal preemption may sell or assign a loan to an investor that is not entitled to federal preemption." *Id.* at *4 n.18.  The letter concluded that, in the event liability was created by the NJ Act, "it might interfere with the ability of federal savings

---

[11] The dissent claims this letter has no bearing as section 560.2 was not issued until 1996.  Dissent at 36–37.  But before section 560.2 was promulgated, courts and the FHLBB recognized HOLA's preemptive effects.  *See* Implementation of New Powers, 48 Fed. Reg. 23,032, 23,032–33 (May 23, 1983); *id.* at 23,058 (to be codified at 12 C.F.R. § 545.2) (recognizing "plenary and exclusive authority of the [FHLBB] to regulate all aspects of the operations of Federal associations . . . preemptive of any state law purporting to address the subject of the operations of a Federal association").

associations to sell mortgages that they originate under a uniform federal system and, thus, be subject to preemption." *Id.*

Although we need look no further than the text of HOLA's implementing regulation to decide this case, the views expressed by FHLBB and OTS only further bolster our conclusion that California's interest-on-escrow law would interfere with the lending operations of savings associations, triggering HOLA preemption.

\* \* \* \*

We hold that HOLA field preemption principles apply to Appellees' claims against Chase, a national bank, even though its conduct giving rise to the complaint occurred after it acquired the loans in question from WaMu, a federal savings association. Because California's interest-on-escrow law imposes a requirement regarding escrow accounts; affects the terms of sale, purchase, investment in, and participation in loans originated by savings associations; and has more than an incidental effect on the lending operations of savings associations, we hold that it is preempted by sections 560.2(b)(6) and (b)(10), and 560.2(c) of the OTS regulation governing the case before us.

**REVERSED and REMANDED.** Each party shall bear its own costs.

GWIN, District Judge, dissenting:

Because the majority opinion reaches a conclusion that the authorizing statute's text does not support; because the majority opinion reaches a conclusion that the regulatory text does not support; and because California is not otherwise preempted from requiring banks to pay nominal interest on escrow account balances, I dissent.

## Introduction

From the 1930s, federal savings associations and national banks were separately regulated.  With their different regulation, federal savings association institutions received different and greater preemption from state laws. In contrast, national banks were separately regulated and national banks, like Chase, had less preemption from state regulations and laws.  Under the Supremacy Clause, states could regulate national banks more than states could regulate federal savings association institutions.

The 2011 Dodd-Frank Act changed this.  Now, federal savings associations and national banks face the same state law preemption exceptions.

California law requires *banks* pay consumers a nominal interest on bank customers' escrow account balances. Before the 2011 Dodd-Frank Act, California did not require similar escrow interest payments by federal savings association institutions.

This case asks us to exempt Chase from paying its California customers nominal interest on escrow balance monies that Chase can otherwise use—but asks for this exemption only on accounts that Chase bought from federal savings association institutions before January 21, 2013.

Chase already pays this escrow interest on loans that Chase generated and pays this interest on loans generated by other national banks.

After January 21, 2013, revised federal regulations require both national banks and federal savings association comply with state escrow interest rate requirements.

Although Chase pays the escrow interest on loans that Chase or other banks generated, Chase says it should not be required to compensate customers whose loans originated with a federal savings association institution before 2013.

### Background

In 1933, and during the Depression, Congress adopted the Home Owners Loan Act ("HOLA") to charter and regulate savings associations at a time when a record number of home loans were in default and many savings associations were insolvent.[1]  "HOLA empowered the regulatory body, which became the [Office of Thrift Supervision ("OTS")], to authorize the creation of federal savings and loan associations, to regulate them, and, by its regulations, to preempt conflicting state law."[2]

At HOLA's 1933 adoption, federal savings association loans were not sold.  The 1933 HOLA legislation said

---

[1] Codified as 12 U.S.C. § 1461 *et seq.*

[2] *Campidoglio LLC v. Wells Fargo & Co.*, 870 F.3d 963, 971 (9th Cir. 2017).

nothing about loan sales and said nothing about transferring any state preemption benefits to loan purchasers.[3]

Within ten years of HOLA's enactment, the Office of Thrift Supervision's predecessor promulgated regulations that suggested that federal savings association loans could be sold.  These early regulations did not say federal preemption followed the loans.[4]

In 1938, Congress created the Federal National Mortgage Association ("Fannie Mae"), establishing a new secondary private market for mortgage loans.  The 1938 Fannie Mae legislation did not change HOLA and only implicitly authorized Fannie Mae's loan sales in a secondary market.[5]  Once again, the Fannie Mae legislation did not say that any HOLA state law preemption followed a loan sale to a buyer not otherwise entitled to the preemption.

In 1978, Congress amended HOLA and, for the first time, explicitly authorized the sales of federal savings association institution generated loans.  The 1978 HOLA amendments said nothing regarding the transferability of any federal savings association preemption.  Congress said nothing regarding preemption transferability despite obvious knowledge and approval for federal savings association loan sales.[6]

---

[3] *McShannock v. JP Morgan Chase Bank N.A.,* 354 F. Supp. 3d 1063, 1076 (N.D. Cal. 2018).

[4] *Id*.

[5] *Id*.

[6] *Id*.

On September 30, 1996, the Office of Thrift Supervision adopted regulations for federal savings associations, 12 C.F.R. § 560.2.[7]  Under its own terms, 12 C.F.R. § 560.2 regulated federal savings associations.  It did not regulate national banks.

Chase is a national bank; Chase is not a federal savings association.  As a national bank, HOLA does not directly regulate or protect Chase.  Nonetheless, Chase argues that HOLA preemption applies because Appellees' loans originated with Washington Mutual, a federal savings association, before Congress passed Dodd-Frank.

While this Court has earlier found broad HOLA preemption, it has not decided whether a non-federal-savings-association entity that acquires a loan from a federal savings association receives HOLA protections for its own post-acquisition conduct.

### Discussion

This case should be simple.  California requires banks pay interest on escrow account balances. This Court's *Lusnak* decision found that national banks must pay California's escrow interest on loans that national banks themselves generated.[8]  Chase is a national bank with California escrow accounts.  It seems obvious—Chase, a national bank and not a federal savings association, should comply with California's escrow interest law.

---

[7] 12 C.F.R. § 560.2 (2017).

[8] *Lusnak v. Bank of America, N.A.*, 883 F.3d 1185 (9th Cir. 2018).

The majority, however, finds that HOLA exempts national banks from paying escrow interest on loans that national banks purchased from a federal savings association before 2013.

First, the majority's opinion gives this one-off exemption from state interest law where the underlying statutory text gives no suggestion that Congress intended to exempt national bank purchased loans, even when those loans were purchased from federal thrift associations.

Second, the majority opinion interprets the critical regulation beyond what the regulation's text supports.

Finally, the majority opinion justifies its disregard of the underlying statute text and regulation text by positing that differing state escrow interest rules will make federal savings association loan sales more difficult because of regulatory costs.

The majority reaches this result even though Congress reached the directly opposite policy judgment in the 2011 Dodd-Frank Act.

The majority opinion also supports its theory by relying on an unrelated law review study that speaks to a completely different issue and says that the described regulatory change had no impact except for secondary sales of usurious loans that were already in default.  Hardly a surprise.

We are not legislators charged with weighing the cost and benefit of the escrow interest requirement.  And with Dodd-Frank, Congress has made its policy judgment by allowing states to require escrow interest.  Even if Dodd-Frank does not control this case, it suggests that Congress

does not believe HOLA preemption should stop state escrow interest requirements.

# I

## A.

Under the Supremacy Clause, federal law preempts conflicting state law but only when Congress intends to preempt state law.[9]  In judging whether Congress intended to preempt state law, including state banking controls, we first look first at the authorizing statute.  As Justice Gorsuch describes:  "Invoking some brooding federal interest or appealing to a judicial policy preference should never be enough to win preemption of a state law; a litigant must point specifically to 'a constitutional text or a federal statute' that does the displacing or conflicts with state law."[10]

The underlying HOLA statute gives only limited regulatory authority.  Before 2010, HOLA gave the Office of Thrift Supervision the power to adopt regulations to "provide for the examination, safe and sound operation, and regulation of Federal *savings associations*."[11]  Consistent with this, HOLA gave the Office of Thrift Supervision

---

[9] U.S. Const., art. VI, cl. 2.

[10] Virginia Uranium, Inc. v. Warren, 139 S. Ct. 1894, 1901 (2019) (quoting Puerto Rico Dept. of Consumer Affairs v. ISLA Petroleum Corp., 485 U.S. 495, 503 (1988)).

[11] 12 U.S.C. § 1463(a)(1) (2010).

authority to adopt regulations "for the . . . *operation[] and regulation of . . . [f]ederal savings associations.*"[12]

The controlling statute gives no suggestion that it authorizes bank regulation. Chase's argument fails because there is no statutory support to allow the Office of Thrift Supervision to regulate banks or to preempt state escrow account interest regulations.

## B.

The majority recognizes that HOLA includes no statutory language extending preemption to banks but suggests we should find such intent from the 1978 HOLA legislation.[13] The 1978 HOLA legislation allowed the sale of federal savings association generated loans. The 1978 HOLA says nothing regarding the transferability of federal savings association state preemption.

The majority says that Congress' decision to expand HOLA to permit savings associations to sell into secondary markets indicates that HOLA preemption should travel with a loan after it is sold.[14]

First, Congress' allowing mortgages to be sold is different from Congress' extending the reach of HOLA

---

[12] 12 U.S.C. § 1464(a).

[13] Maj. Op. 12 ("Although there is nothing in the text or the legislative history of HOLA that references the transfer of loans from a federal savings association in a secondary market, the district court erred by discounting the subsequent amendments to HOLA and the [Office of Thrift Supervision]'s regulations.").

[14] Maj. Op. 12.

preemption.  Congress' knowledge of and approval for the sale of federal savings association loans says nothing regarding whether Congress intended federal preemption to follow the loan.  Congress already regulated national banks and already decided to give national banks less protection from state laws.  That the 1978 HOLA legislation allowed the sale of savings association loans says little regarding Congress' intent to allow national banks to escape state regulation.

Second, what is good for the goose is good for the gander.  If the Court considers the 1978 HOLA legislation (which contained no specific reference to extending preemption to banks), then the Dodd-Frank Act and its attending regulations (explicitly authorizing state escrow interest requirements) should be considered.

California's interest-on-escrow law does not affect the operation of a federal savings association in this instance. To excuse Chase from California's interest-on-escrow law via 12 C.F.R. § 560.2 would exceed the statutory authority granted to the Office of Thrift Supervision to regulate federal savings associations.[15]

## II

### A.

Even if the Office of Thrift Supervision had authority to regulate banks' escrow interest obligations, the relied-upon regulation, 12 C.F.R. § 560.2, cannot be fairly read to

---

[15] *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("[A] federal agency may pre-empt state law only when and if it is acting within the scope of its congressionally delegated authority.").

preempt state escrow interest laws when applied to national banks.

Section § 560.2(a) described HOLA's regulatory intent. Regarding preemption, the regulation says:

> [The Office of Thrift Supervision] is authorized to promulgate regulations that *preempt state laws affecting the operations of federal savings associations* when deemed appropriate to facilitate the safe and sound *operation of federal savings associations*, to enable *federal savings associations* to conduct their operations in accordance with the best practices of thrift institutions in the United States, or to further other purposes of the HOLA.

When the 12 C.F.R. § 560.2(a) language is given its natural interpretation, it only preempts a state law when the state law affects *federal savings association operations*. And, "operation" is understood as "the fact of operating or being active," "a method or manner of functioning," and defined as "the action of operating a . . . business."[16]

Chase is a national bank, not a federal thrift association. With Washington Mutual long gone, 12 C.F.R § 560.2 does not affect the operation of a federal thrift association.

Further, the 12 C.F.R § 560.2 regulation's field-preemptive language limited itself to federal savings associations:  "To enhance safety and soundness and to

---

[16] *Operation*, Cambridge Dictionary, https://dictionary.cambridge. org/us/dictionary/english/operation (last visited Aug. 28, 2020).

enable federal savings associations to conduct their operations in accordance with best practices . . . [the Office of Thrift Supervision] hereby occupies the *entire field of lending regulation for federal savings associations*."[17]

The negative inference, *expressio unius est exclusion alterius* (the inclusion of one is the exclusion of others), applies.  Under 12 C.F.R. § 560.2, the Office of Thrift Supervision received express authority to regulate savings and loan associations but not banks.  "As we have held repeatedly, the *canon expressio unius est exclusio alterius* . . . has force only when the items expressed are members of an 'associated group or series,' justifying the inference that items not mentioned were excluded by deliberate choice, not inadvertence."[18]

The regulation's preemption language limited preemption to lending regulation and to federal savings associations.  As described in the regulation:  "[The Office of Thrift Supervision] intends to *give federal savings associations* maximum flexibility to *exercise their lending powers* in accordance with a uniform federal scheme of regulation."[19]   The regulation went on to cabin its application:   "Accordingly, *federal savings associations* may extend credit as authorized under federal law, including this part, *without regard to state laws purporting to regulate or otherwise affect their credit activities*."[20]

---

[17] 12 C.F.R. § 560.2(a).

[18] *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003).

[19] 12 C.F.R. § 560.2(a).

[20] *Id*.

The 1996 adoption of 12 C.F.R. § 560.2 must have been made with knowledge that federal savings and loan associated loans had been sold to national banks.  The Office of Thrift Supervision's failure to seek preemption protections for federal savings association loans sold to national banks implies an intent not to preempt California's escrow interest state law.

By the language used, 12 C.F.R. § 560.2 applied to federal savings associations.   By the language used, 12 C.F.R. § 560.2 limited its preemption to state laws regulating federal savings association credit activities.  By the language used, 12 C.F.R. § 560.2 did not apply to banks.

**B.**

The majority principally relies on two historical facts in the evolution of HOLA regulation to show that 12 C.F.R. § 560.2 preemption was intended to flow through to a third party that purchased a loan from a federal savings association:

First, the majority cites a 1985 opinion letter from the predecessor agency to the Office of Thrift Supervision.[21]  Only a single line in the letter could be read to address the sale of loans to a third party:  "Such preemption would exist regardless of whether the loans in question are sold by the federal association to a third party…."[22]  This 1985 opinion letter predates the 1996 12 C.F.R. § 560.2's implementation

---

[21] Maj. Op. 23.

[22] *Id.* (citing FHLBB Op. General Counsel, 1985 FHLBB LEXIS 178, at *5 (Aug. 13, 1985)).

and is not an interpretation of, or based upon, the regulation.[23]

Second, a 2003 opinion letter from the Office of Thrift Supervision states that loan terms should not change "simply because an originator entitled to federal preemption may sell or assign a loan to an investor that is not entitled to federal preemption."[24]  Although a similar issue, this case does not involve loan terms.

These historical notes do not warrant the majority's deference and do not indicate Congress' intent to allow preemptive effect to travel with loans sold by federal savings associations to third parties.[25]

As the majority recognizes, the Supreme Court's decision in *Kisor v. Wilkie*, cautions against deference to an agency's interpretation when a regulation is not genuinely ambiguous.  Here, 12 C.F.R. § 560.2 regulated federal savings associations, not national banks.  Even if 12 C.F.R. § 560.2 was ambiguous, the two historical notes on which the majority relies do not merit deference because they are not interpretations that "reflect an agency's authoritative, expertise-based, fair[, or] considered judgment."[26]

---

[23] *See* 12 C.F.R. § 560.2.

[24] Maj. Op. 24 (citing Preemption of N.J. Predatory Lending Act, Office of Thrift Supervision Op. Letter, P-2003-5, 2003 WL 24040104, at *4 n.18 (July 22, 2003)).

[25] Maj. Op. 12.

[26] *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019) (internal quotations omitted). *See also* Maj. Op. 12 n.7.

The majority does not show that 12 C.F.R. § 560.2 preemption was meant to flow through to a third party that purchased a loan from a federal savings association. Once Chase held the loans, the loans were no longer a part of "the operation of federal savings associations," and the regulation does not govern Chase's conduct.[27]

## III

Finally, the majority's concern about potential "effects" is misguided.

Section 560.2(c) provides that state laws that have "only an incidental effect on lending operations" are not preempted.[28] The majority argues that a finding against preemption would allow "states to impose a panoply of requirements on loans originated by savings associations [that would] impede[] the securitization of these loans" by creating uncertainty and leading to compliance costs.[29] The majority believes that non-preemption would create more than an "incidental effect" because Chase would have to adhere to California's interest-on-escrow law.

In this case, we consider the California escrow-interest provision. We do not bear responsibility for protecting Chase from some panoply of not-yet-enacted state banking regulation.

Also, this decision will have no going-forward effect. Regardless of how this case is decided, for contracts entered

---

[27] 12 C.F.R. § 560.2(a).

[28] 12 C.F.R. § 560.2(c)(6)(ii).

[29] Maj. Op. 18.

after January 21, 2013, federal-thrift-generated loans receive the same preemption treatment as national-bank-generated loans. Since January 21, 2013, both federal savings associations and banks must now "*pay interest to the consumer on the amount* held in any impound, trust, or *escrow account* . . . in the manner as *prescribed by that applicable State or Federal law*."[30]

Additionally, it is not clear that permitting Chase to evade California's law for loans purchased from federal savings association institutions before January 21, 2013, would make the secondary market for loans less attractive overall. Chase already complies with California's escrow interest laws on loans that Chase or other national banks underwrote.

The majority also cites a study based on a "natural experiment" following the Second Circuit's decision in *Madden v. Midland Funding, LLC* to support its argument that ruling against preemption will cause more than an "incidental effect."[31]

In *Madden*, the Second Circuit held that the National Banking Act did not preempt New York's and Connecticut's usury law's application to debts originally issued by national banks and then sold in the secondary market.[32]

---

[30] 15 USC § 1639d(g)(3). Section 1639d—requiring savings association compliance with state escrow interest laws—became effective on January 21, 2013. *Lusnak*, 883 F.3d at 1197.

[31] 786 F.3d 246 (2d Cir. 2015), *cert. denied*, 136 S. Ct. 2505 (2016).

[32] *Id*. at 249–51. *See also* Maj. Op. 18–19.

The article measures the Second Circuit's opinion's impact on the secondary sales of usurious loans in three states.[33]  The *Madden* decision allowed all New York and Connecticut usurious loan customers to walk away from their usurious loans without any liability.

Against this backdrop, where secondary purchasers could lose all right to recover, the article surprisingly finds little impact:  "[T]he discount is highly economically meaningful for notes backed by noncurrent loans but close to 0 for current loans.  These findings indicate that debt holders . . . were not especially concerned unless borrowers were already late on their payments."[34]

*Madden* is wildly different from this case.  After *Madden*, the law review article finds no secondary loan sales impact for current loans and only limited secondary loan sales impact for non-current loans *that are not enforceable*.[35]

*Madden* also disrupted a long-held belief that national banks were exempt, under federal banking law, from state limits on interest rates.  Uncertainty and risk to lenders stemmed from the unknown disposition of the *Madden* case; for example, there was a chance that the Supreme Court would take up the case, which it did not.[36]  In this case, a

---

[33] Colleen Honigsberg et al., How Does Legal Enforceability Affect Consumer Lending? Evidence from a Natural Experiment, 60 J.L. & Econ. 673, 674–75 (2017).

[34] *Id.* at 675.

[35] *Id*.

[36] Again, the study the majority cites only reviewed data from the year following the *Madden* decision.  *Id.* at 673–74.

ruling against preemption would treat these loans as they would have been treated if they had been originated post-Dodd-Frank and there is no evidence that post-Dodd-Frank-originated loans have disrupted the secondary market.

## Conclusion

This case is fundamentally about statutory interpretation. Justice Gorsuch appropriately describes how the actual text of statutes and regulations should control:

> Rather than beginning with legislative history or making economic hypotheses about social consequences, a textualist starts with dictionary definitions, rules of grammar, and the historical context in which a law was adopted to see what its language meant to those who adopted the law. In this way, textualism offers a known and knowable methodology for judges to determine impartially and fix what the law is, not simply declare what it ought to be—a method to discern the written law's content without extraneous value judgments about person or policies.[37]

Instead of heeding this advice, the majority ignores the text of the relevant statutes and regulations and instead hypothesizes about the economic impact of a finding against preemption.

For the foregoing reasons, I believe that the majority should not stretch the HOLA's application and its

---

[37] Neil M. Gorsuch, *A Republic, If You Can Keep It* 131–32 (2019).

accompanying     regulations     to     excuse     Chase     from
California's interest-on-escrow law.  I respectfully dissent.